Argued and submitted April 10, 2014, Gold Beach High School, Gold Beach, reversed and remanded June 24, petition for review denied December 10, 2015 (358 Or 449)

Claude HADLEY,
*Plaintiff-Appellant,*

*v.*

EXTREME TECHNOLOGIES, INC.,
a corporation doing business under
the assumed business name of BowTech,
*Defendant-Respondent.*

Lane County Circuit Court
161103225; A151851

355 P3d 132

Travis Eiva argued the cause and filed the briefs for appellant.

Todd R. Johnson argued the cause for respondent. With him on the brief was Hershner Hunter, LLP.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Wollheim, Senior Judge.

LAGESEN, J.

**LAGESEN, J.**

Defendant, Extreme Technologies, Inc., designs, manufactures, and sells archery equipment, including bows. When plaintiff, Claude Hadley, agreed to share with defendant his idea for a new bow design, which was unknown in the industry at the time, the parties entered into a nondisclosure agreement. Under the agreement, defendant agreed not to independently use or disclose the information provided to it by plaintiff for a period of two years; if defendant did independently use or disclose the information, plaintiff would be entitled to a broad range of remedies. Plaintiff ultimately sued defendant, alleging that defendant breached that agreement by using the information that plaintiff shared with it to develop its own new bow, which defendant put on the market just short of two years after its meeting with plaintiff. The case went to trial, and the jury determined that defendant breached the agreement but that the breach had not caused plaintiff to suffer any damages.

The issue on appeal is whether the trial court erred in instructing the jury that a portion of the agreement was ambiguous and that it was the jury's job to determine what the agreement meant and, if the trial court erred in doing so, whether that error "substantially affect[ed] the rights" of plaintiff, so as to require reversal under ORS 19.415. We conclude that the trial court erred. We also conclude that the error "substantially affect[ed]" plaintiff's rights, because there is some likelihood that it caused the jury to apply the wrong legal rule in determining whether defendant's breach of the agreement caused plaintiff to suffer damages. For that reason, we reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff is an inventor from Alabama. Defendant is Extreme Technologies, Inc. (also known as "BowTech"), a corporation that manufactures archery bow products. By early 2005, plaintiff had developed a prototype of a new compound archery bow. The prototype, described by plaintiff as

---

[1] The jury found that defendant breached its agreement with plaintiff but further found that the breach did not cause plaintiff to suffer damages. We state the facts in a manner consistent with that verdict.

a "'catapult' system" bow, used a "forked riser" that served as a "center point for the bow limb to pivot on" (the "Catapult Riser").

In February 2005, plaintiff contacted defendant and informed the corporation's president, Strasheim, that he had developed designs, including the prototype of the Catapult Riser, which might interest the company. Defendant provided, and both parties signed, what the parties titled a "Non-Disclosure Agreement." That agreement provided, in pertinent part:

"Claude Hadley (hereinafter Inventor) an individual inventor having a place of residency in Brewton, Alabama, plans to reveal certain proprietary information concerning a compound bow design or accessory for a compound bow, owned by Inventor, to BowTech and [Strasheim] (here[i]nafter Recipient) solely for the purpose of evaluating the information for prospective future negotiation between Inventor and Recipient and for no other reason.

"The information to be disclosed by Inventor to Recipient includes the design(s) of proprietary information. Recipient (on behalf of himself and on behalf of his company, officer[s], directors, agents, employees, and affiliates and/or functional equivalents) acknowledges that such information is special, valuable and [a] unique asset of the Inventor. In consideration of receiving such information, Recipient agrees, by the duly authorized signature below, to use such information for the above Purposes only unless otherwise hereafter agreed to in writing by Inventor, and to use best efforts to maintain the confidentiality of the Information, which includes limiting[] access to the Information to those officers, directors and employees within Recipient's organization and/or within Recipient's control who reasonably require access in order to accomplish the purpose outlined in this Agreement, and who are under an obligation to keep said information confidential. Recipient shall be responsible for maintaining the confidentiality of the Information disclosed to others by Recipient and will be liable to the full extent of the law for any unauthorized disclosures arising out of Inventor's disclosure to Recipient.

"Recipient agrees not to reproduce or reverse engineer nor attempt to obtain additional knowledge beyond the scope of the Information for any purpose. Recipient agrees

not to independently develop concepts, ideas or designs or market [the] same which arise out of or are related to any features or characteristics of the Information.

"This commitment shall impose NO obligation upon Recipient with respect to any portion of the Information which:

"1.   is now, or which hereafter, through no act or failure to act on Recipient's part, becomes generally known or available to the public;

"2.   is known to Recipient at the time said information is received from [I]nventor;

"3.   is hereafter furnished to Recipient by a third party as a matter of right and without restriction o[n] disclosure;

"4.   is furnished to others by Inventor without restriction on disclosure;

"5.   is independently developed by Recipient provided that the person or persons developing [the] same have not had access to any part of the information as furnished by Inventor nor received any guidance, whether direct or indirect, from Recipient of the information; or

"6.   *after two (2) years from receipt of the Information.*

"* * * * *

"Recipient and Inventor agree that the laws and courts of the State of Oregon, USA, will govern this Agreement and any disputes arising thereunder since the [B]reach of this Agreement will cause irreparable harm to Inventor, it is agreed that in such event Inventor will be entitled to attorney fees, equitable relief, and other remedies, in order to restrain and/or recover from any Breach."

(Emphasis added.)

After signing the agreement on February 23, 2005, plaintiff sent defendant two cam designs,[2] along with three photographs of each design. Plaintiff also provided two photographs of the Catapult Riser prototype. In a follow-up phone call with Strasheim and several of his colleagues shortly after the nondisclosure agreement was executed, plaintiff described the operation of this Catapult Riser design:

_____
[2] A "cam" is part of the pulley system of a compound bow.

"I told him how the rollers would allow the bow limb, when you bend it like this—[you've] seen some of their demonstrations where they would bend the bow limb, you know, and how they show you how it flexed back. You know, and that's the whole point of this thing, is that when you bend the bow limbs, it allows the bow limbs to flex from tip to tip."

Plaintiff then fielded questions about the prototype.

While plaintiff was explaining the Catapult Riser concept, Strasheim interjected: "I'm sorry. * * * This ain't going to work. * * * I don't think this idea is going to do what you think it's going to do." Strasheim then informed plaintiff that defendant was not going to be interested in the prototype. Plaintiff had no further contact with defendant after that conversation.[3]

Approximately one year and eight months after plaintiff and defendant entered into the nondisclosure agreement, on November 1, 2006, an employee of defendant, Yehle, filed a provisional patent application with the United States Patent and Trademark Office (U.S. Patent Office) for "Center-Pivot Limbs for an Archery Bow." Yehle's "center-pivot" design resembled plaintiff's "Catapult Riser" design, and plaintiff believed that defendant had developed it from the Catapult Riser prototype that he had shared with defendant. In late 2006, defendant released two products that employed that center-pivot technology: the Guardian model (designed for bow hunters) and the Commander model (designed for target shooters). Over the next few years, defendant released revised models of its center-pivot bows; the design became one of defendant's flagship products. On November 16, 2010, the U.S. Patent Office granted Yehle's patent application; Yehle assigned that patent to defendant.

---

[3] After that conversation, in conjunction with Ben Pearson Archery, plaintiff developed a "catapult bow pocket," an "offshoot" of the Catapult Riser concept, to be sold as an accessory. On September 26, 2005, plaintiff filed a provisional patent application with the United States Patent and Trademark Office for the "Bow Pocket Catapult System." On October 25, 2006, plaintiff filed another provisional patent application for a further refined version of the same product. Plaintiff understood that Ben Pearson Archery would pay for a full patent on the Bow Pocket Catapult System if it went to market, but the company ultimately ceased development of the product. At no time did plaintiff file for a provisional patent on the Catapult Riser prototype.

In early 2011, plaintiff sued defendant, alleging claims for breach of the nondisclosure agreement, unjust enrichment, and injunctive relief. In his amended complaint, plaintiff alleged that defendant's 2007 line of archery bow products "contained many of the new design elements" of the Catapult Riser prototype and that the patent assigned to defendant "disclosed an archery bow design that uses concepts, ideas, or designs of [plaintiff]'s catapult technology that he disclosed to [defendant]." Plaintiff asserted that defendant breached the parties' nondisclosure agreement in one or more of the following ways:

"(a)  Using the information disclosed by Claude Hadley to Extreme Technologies, Inc. for a purpose other than to evaluate the information for prospective negotiation between the parties;

"(b)  Not using best efforts to maintain the confidentiality of the information disclosed by Claude Hadley and failing to properly limit the access to the information confidentially disclosed by Claude Hadley to Extreme Technologies, Inc.;

"(c)  Failing to maintain the confidentiality of the information disclosed to it by Claude Hadley;

"(d)  Developing and marketing concepts, ideas, and designs which arose out of and/or had the same features and characteristics of the catapult riser prototype, design, and information that Claude Hadley disclosed to it on or about February 23, 2005;

"(e)  Claiming ownership of the catapult riser design disclosed to it by Claude Hadley;

"(f)  Allowing its employee Yehle to file for patent protection using concepts, ideas, and designs, which arose out of, or were related to, and/or contained the same features and characteristics as the catapult bow prototype and information that Claude Hadley disclosed to Extreme Technologies, Inc.;

"(g)  Accepting the assignment of the 'Center Pivot Limbs for an Archery Bow' patent which was issued to its employee Yehle;

"(h)  Failing to compensate Claude Hadley for the use of information which was considered a special, valuable, and unique asset by the parties;

"(i) Improperly using, disclosing, and transferring Claude Hadley's confidential information; and

"(j) Wrongfully manufacturing, marketing, and selling its bows which arose out of, or were related to, the design and information furnished by Claude Hadley."

The case proceeded to trial. Recognizing that plaintiff sought both legal and equitable remedies, the trial court bifurcated the trial, ruling that the breach-of-contract claim and breach-of-contract remedies would be tried to the jury and that, if plaintiff prevailed, the court would give the parties the opportunity to present evidence regarding broader equitable remedies allowed by the contract and would determine plaintiff's entitlement to equitable relief.

At trial, plaintiff's theory was that plaintiff had shared with defendant his prototype for a center-pivot bow and that defendant had used that prototype to develop its own center-pivot bow during the two-year time period that defendant was bound not to use the information provided to defendant by plaintiff, in breach of the parties' nondisclosure agreement. As to damages, plaintiff contended that defendant's breach harmed plaintiff because defendant was not paying plaintiff the royalties for his contribution to defendant's center-pivot bow design that, in plaintiff's view, defendant was obligated to pay plaintiff if it used plaintiff's information before the expiration of the two-year period. Plaintiff also contended that, by employing plaintiff's Catapult Riser design in its own models and then releasing those models to the public for sale, defendant breached the confidentiality provisions of the nondisclosure agreement, harming plaintiff by preventing him from earning money from his own innovative design, which was, as a result of defendant's conduct, available to the industry at large. Plaintiff estimated that he had suffered losses in the range of $13 million to $21 million; plaintiff estimated that defendant would have been obligated to pay him $5 million to $9 million in royalties had it properly licensed his design from him, and that defendant's dissemination of plaintiff's design damaged defendant by another $8 million to $12 million in sublicensing fees from third parties to which plaintiff otherwise would have been entitled.

Defendant's primary theory was that plaintiff had never shared his Catapult Riser design with defendant, and the parties' nondisclosure agreement covered only the cam designs, which defendant acknowledged receiving from plaintiff. Defendant's alternative theory was that, even if the parties' agreement covered plaintiff's Catapult Riser design, and even if plaintiff had, in fact, shared that design with defendant, defendant did not breach the nondisclosure agreement, because the evidence demonstrated that defendant did not "steal" plaintiff's idea. Defendant further asserted that, even if defendant did take plaintiff's idea, plaintiff's damages were between $0.50 to $6.00 per bow, not the $20.00 to $30.00 per bow that plaintiff claimed.

Defendant also raised two defenses which were submitted to the jury over plaintiff's objection. First, defendant raised the defense of plaintiff's failure to mitigate damages, contending that, in failing to act sooner than he did to seek redress for defendant's alleged breach, plaintiff failed to mitigate his damages, and, as a result, his recovery should be limited. Defendant requested that the trial court instruct the jury in accordance with Uniform Civil Jury Instruction 73.01, which provides, "A person who suffered damage has a duty to exercise reasonable care to avoid increasing that damage. There can be no recovery for increased damage caused by the failure to exercise such care."[4]

Plaintiff moved for a directed verdict on that defense and objected to defendant's proposed instruction to the jury, arguing that the evidence was insufficient, under *Cardinell Crest Homeowners Assoc. v. Lord*, 160 Or App 452, 982 P2d 35, *rev den*, 329 Or 318 (1999), to demonstrate that plaintiff had any duty to mitigate damages. Alternatively, plaintiff

---

[4] In fact, defendant initially requested the following modified version of Uniform Civil Jury Instruction 73.01:

"You cannot award [p]laintiff money for any portion of his loss that [p]laintiff reasonably could have avoided if he would have exercised reasonable care and business prudence to minimize his loss. If you find that [p]laintiff could have avoided some portion of his loss had he exercised reasonable care, that portion should be subtracted from [p]laintiff's money award."

After a hearing, however, where the trial court rejected defendant's proposed instruction on the ground that it "risk[ed] the possibility of a double subtraction," defendant offered the standard Uniform Civil Jury Instruction 73.01 (noting that the instruction was "objected to but offered in light of March 13, 2012 hearing").

requested that, in the event that the trial court instructed the jury on the duty to mitigate damages, the trial court also instruct the jury on the circumstances that would show that plaintiff had no duty to mitigate damages, as established by *Cardinell Crest*. Specifically, plaintiff requested the following modified version of Uniform Civil Jury Instruction 73.01:

> "A person who suffered damage has a duty to exercise reasonable care to avoid increasing that damage. There can be no recovery for increased damage caused by the failure to exercise such care. *However, a plaintiff has no duty to avoid increasing damages if it is the defendant's duty primarily to perform the contract and the defendant has equal opportunity to perform its duties under the contract and has equal or greater knowledge of the damages that would be caused to the plaintiff by the defendant's nonperformance of the contract."*

(Emphasis added.) The trial court denied plaintiff's motion for a directed verdict and instructed the jury on the duty to mitigate in accordance with Uniform Civil Jury Instruction 73.01, using defendant's proposed instruction, but it did not give plaintiff's instruction on the exception to the duty to mitigate.

Second, defendant argued that the portion of the nondisclosure agreement that specified that it "shall impose NO obligation upon [defendant] with respect to any portion of the Information which [*sic*] *** after two (2) years from receipt of the Information" meant that, after February 23, 2007—two years after the date that the agreement was executed—defendant could no longer be "held responsible" for any breach of the agreement. In particular, defendant asserted that the "two-year" provision plausibly could be construed to mean either that defendant's liability for damages ended two years after defendant's receipt of the information or, alternatively, that plaintiff was barred from suing for damages two years after the date that defendant received the information from plaintiff. Defendant requested that the trial court instruct the jury that "the Nondisclosure Agreement imposes no obligations upon [d]efendant after two years from receipt of the information provided by [p]laintiff."

Plaintiff disagreed that the nondisclosure agreement plausibly could be interpreted to mean that defendant could not be "held responsible" for any breach of the agreement after February 23, 2007, arguing that the only reasonable interpretation of the two-year provision was as a standard sunset clause on defendant's obligations of nondisclosure and nonuse of the information. Plaintiff moved for a directed verdict[5] on the meaning of the two-year provision or, in the alternative, a limiting instruction. The trial court denied plaintiff's motion.

Plaintiff then renewed those arguments when contesting defendant's proposed jury instructions. Plaintiff reiterated his position that the disputed provision was an unambiguous sunset on defendant's nondisclosure and nonuse obligations, and that it did not operate to deprive plaintiff of a remedy for defendant's breaches of the agreement during the two-year period. While continuing to assert that the provision was not susceptible to the interpretation given to it by defendant, plaintiff alternatively argued that, if the court decided that defendant's proffered interpretation of the provision—namely, as a discharge of defendant's duty to pay *damages* after that period had elapsed—was also reasonable, then the court was required to instruct the jury that the agreement was ambiguous and further instruct the jury as to how to resolve that ambiguity.

The trial court explicitly acknowledged that defendant's proposed interpretation of the agreement was not one that it could "see." It nonetheless concluded that the provision at issue was ambiguous and that its meaning was a fact question for the jury. The court instructed the jury as follows:

*"I have determined that an important part of the contract does not clearly state what the parties intended that part of*

---

[5] On appeal, plaintiff acknowledges that, although the motion below was "phrased as a directed verdict motion," it was "technically a motion for a peremptory instruction on the legally correct interpretation of [the two-year provision] and a motion to exclude contrary arguments to the jury." Plaintiff's improper characterization of the motion below does not render its denial unreviewable. *See Childers v. Spindor*, 91 Or App 119, 122, 754 P2d 599 (1988) (treating motion as sufficient for review where plaintiff should have requested peremptory instructions but instead moved for a directed verdict, on the ground that the effect of either motion would be to "remove [the] issues from the jury's consideration").

*the contract to mean. Because it is not clear, there are two possible meanings.* The parties disagree on the meaning of the contractual term[:] [']This commitment shall impose no obligation upon the recipient with respect to any portion of the information which: After two years from the receipt of the information.[']

"The plaintiff says that this part of the contract means the defendant breaches the nondisclosure agreement if it develops, markets, uses or discloses the information that plaintiff disclosed under the agreement within two years from the date the parties entered into the agreement.

*"The defendant says that this part of the contract means that defendant has no obligation to pay plaintiff for any damage he incurred after February 23rd, 2007; and, two, plaintiff's right to sue defendant for damages lapsed on February 23rd, 2007.*

"You are to weigh all the evidence about what the parties intended this unclear part of the contract to mean at the time they were entering into the contract. In determining the intent of the parties, you must consider the situation of the parties at the time they agreed to the contract; statements the parties made during the time they negotiated and agreed to the contract; statements the parties made, and things they did, that relate to * * * the unclear part of the contract after the parties agreed to the contract and before there was this dispute about it; earlier conduct between the parties that relates to the subject of the contract; testimony of the parties regarding the meaning of the ambiguous terms.

"If, after considering these factors, you can decide what the parties intended this unclear part of the contract to mean, then that is the meaning you are to give that part of the contract. If you still cannot decide what the parties intended the unclear part of the contract to mean after considering these factors, then you are to reject the meaning of the party who created the unclear language. Instead, use the meaning of the party who did not create the unclear language in the contract."

(Emphases added.)

Although the jury was instructed that it had to determine the meaning of the disputed contractual provision, the general verdict form did not include a question

about that issue. The verdict form posed the following four questions to the jury:

"1. Did Defendant Extreme Technologies, Inc., and Plaintiff Claude Hadley *enter into a contract?*

"* * * * *

"2. Did Defendant Extreme Technologies, Inc., *breach the contract* with Plaintiff Claude Hadley in one or more of the ways that Plaintiff claims?

"* * * * *

"3. Did Defendant Extreme Technologies, Inc.'s breach of the contract *cause Plaintiff Claude Hadley to suffer damages?*

"* * * * *

"4. Please identify the *amount of Plaintiff Claude Hadley's damages* in relation to the following:

"(A) What is the amount of any damages based on the past and/or future reasonable royalty or licensing fees for bows for Defendant Extreme Technologies:

"* * * * *

"(B) What is the amount of any damages based on the past and/or future sub-licensing fees for bows for third parties.

"* * * * *."

(Emphases added.) After each question, the verdict form instructed the jury that a "no" answer meant that it should stop deliberating without addressing the subsequent questions.

During deliberations, the jury sent the following two written questions to the trial court on a single sheet of paper: (1) "Are we as a jury supposed to vote on the 'ambiguity in contract' and resolve it as a whole jury?" and (2) "If we have 9 jurors vote yes on #2 [breach], are they the only 9 that can vote on #3 [causation]?" In response, the trial court instructed the jury that "[t]he answer to both questions [is] at least the same nine jurors must agree on each answer."[6]

---

[6] The proceedings to address the jury questions either took place off of the record or were not transcribed. However, the trial court file contains a filed copy

The jury determined that plaintiff and defendant had entered into a contract, and that defendant breached the contract, answering "yes" to the first two questions on the verdict form. The jury answered "no" to the third question as to whether defendant's breach caused plaintiff to suffer damages, and, as directed by the verdict form, the jury did not reach the fourth question (amount of damages). The jury did not separately record its answer as to how it interpreted the disputed provision of the contract.

After discharging the jury, the court allowed supplemental briefing from the parties as to whether, in the light of the jury's verdict, plaintiff could still seek equitable remedies. Ultimately, although the jury had found that defendant breached the parties' contract, the court ruled that the jury's finding that defendant's breach or breaches of contract did not cause plaintiff to suffer any damages precluded the court from providing any equitable remedies to plaintiff. Alternatively, the court found that plaintiff had not proved that he was entitled to recover any damages under a theory of unjust enrichment. The court thereafter entered a general judgment in favor of defendant.

Both parties petitioned for attorney fees; plaintiff contended that the nondisclosure agreement should be construed to permit him to recover his fees, notwithstanding the fact that he had not prevailed; defendant contended that ORS 20.096(1) made the contract's provision on attorney fees reciprocal, entitling defendant to recover its fees. The trial court agreed with defendant and entered a supplemental judgment awarding defendant $557,834.00 in attorney fees and $22,053.03 in costs.

Plaintiff timely appealed the general judgment and supplemental judgment. Plaintiff's primary contention on appeal, and the subject of his first three assignments of error, is that the trial court erred when it determined that the two-year provision of the nondisclosure agreement was ambiguous and submitted the issue of that provision's

---

of the answer to the jury questions that is signed by the trial judge, and the case register contains an entry reflecting that the jury was instructed in the manner stated above. From that, we infer that the jury was instructed in the manner reflected by the record.

meaning to the jury.[7] Plaintiff also assigns error to the trial court's (4) denial of plaintiff's request to put on evidence in support of his equitable claims, (5) finding that the jury verdict precluded plaintiff's equitable claims, (6) finding that plaintiff did not prove that defendant was unjustly enriched, (7) denial of plaintiff's request for attorney fees, (8) grant of defendant's request for attorney fees, (9) denial of plaintiff's motion for a directed verdict on defendant's duty-to-mitigate defense, (10) delivery of the jury instruction on plaintiff's duty to mitigate damages, and (11) denial of plaintiff's jury instruction that his duty to mitigate damages was limited.

## STANDARDS OF REVIEW

The primary and, ultimately, dispositive issue in this appeal is whether the trial court erred when it concluded that the two-year provision of the nondisclosure agreement was ambiguous and that, therefore, the issue of the provision's meaning was a question of fact for the jury. We review for legal error a trial court's determination that a provision of a contract is ambiguous, that is, susceptible to more than one reasonable interpretation. *Edwards v. Merle West Medical Center*, 147 Or App 71, 77, 935 P2d 442 (1997).

## ANALYSIS

Plaintiff's first three assignments of error present, essentially, the same issue: whether the trial court erred when it ruled that the issue of the proper interpretation of the two-year provision was a question of fact for the jury. Plaintiff argues that that provision—which provides that the nondisclosure agreement "shall impose NO obligation upon [defendant] with respect to any portion of the Information which [*sic*] * * * after two (2) years from receipt of the Information"—is unambiguous as a matter of law, and the only reasonable interpretation is as a sunset clause on defendant's nondisclosure and nonuse obligations.[8]

---

[7] Plaintiff assigns error to the trial court's denial of plaintiff's motion for a directed verdict on the interpretation of the contract, the trial court's denial of plaintiff's motion to prevent defendant from arguing its interpretation of the contract, and the court's decision to submit to the jury the issue of the correct interpretation of the provision.

[8] As noted earlier, in the agreement, the words "shall impose NO obligation upon [defendant] with respect to any portion of the Information which" precede

In response, defendant does not contest plaintiff's argument in any developed way.[9] Regardless, based on our own review of the provision at issue, we conclude that, as matter of law, the provision is unambiguous and susceptible only to the interpretation advanced by plaintiff.

Whether a contractual provision is ambiguous is a legal question. *Williams v. RJ Reynolds Tobacco Company*, 351 Or 368, 379, 271 P3d 103 (2011). If a contractual provision is unambiguous—meaning subject to only one plausible interpretation—then "interpretation of the contract is also one of law for the court." *Id.*; *Sunset Coatings Co., Inc. v. Dept. of Trans.*, 62 Or App 53, 56, 660 P2d 164, *rev den*, 294 Or 792 (1983) (citing *Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or 639, 643, 576 P2d 1244 (1978)).

Here, the disputed provision is susceptible to only one plausible interpretation: that, after two years, defendant is no longer restricted from using or disclosing plaintiff's information. That is what the provision says by its plain terms and, when viewed in the context of the rest of the agreement, that plainly is what it means. The agreement imposed a number of specific obligations on defendant with respect to any information provided by plaintiff:

---

a list of six exceptions to the restrictions on defendant's use or disclosure of the information. The word "which" is a natural lead-in to the first five of the six exceptions, but is awkward as a lead-in to the sixth exception—the one at issue here—which reads "after two (2) years from receipt of the Information." Notwithstanding that awkwardness, we are, for the reasons explained in the body of the opinion, persuaded that the provision is unambiguous and is not susceptible to the interpretation placed on it by defendant.

[9] In its opening brief, defendant does not make any argument in support of the trial court's ruling that the provision is ambiguous; defendant contends only that any error was harmless. After oral argument, this court requested that the parties submit supplemental briefing addressing the effect of the Supreme Court's decision in *Purdy v. Deere and Company*, 355 Or 204, 324 P3d 455 (2014), which was decided after oral argument in this case. In its supplemental brief, defendant included the following footnote:

"The trial court properly found that the [two-year] provision in this case was ambiguous, and consequently, there was no error. Among other reasons that the two-year limitation is subject to more than one reasonable interpretation, the [nondisclosure agreement] does not define the obligations that are limited by the provision. Moreover, [p]laintiff testified that, at the time that he executed the [nondisclosure agreement], he understood the two-year limitation to have the same meaning as [d]efendant's interpretation."

Defendant had also made a statement to that effect at oral argument.

(1) Defendant was required to keep the information confidential; (2) defendant could not "reproduce or reverse engineer [or] attempt to obtain additional knowledge beyond the scope" of the information; and (3) defendant could not "independently develop concepts, ideas or designs or market [the] same which arise out of or are related to any features or characteristics" of the information. The contested provision simply specifies that those agreed-to obligations end two years after the date on which defendant receives the information from plaintiff, meaning that, if defendant uses or disseminates the information after the two-year period expires, then defendant will not have breached the agreement. We see nothing in the wording of the agreement that would permit a reasonable conclusion that the parties intended the provision to mean anything other than what it says: that defendant's obligations with respect to use and dissemination of the information end after two years.

In addition, and perhaps more crucially, defendant's interpretation of the provision is implausible. As noted, defendant asserted that the provision plausibly could be construed to mean either that defendant's liability for damages ended two years after defendant's receipt of the information or, alternatively, that plaintiff was barred from suing for damages two years after the date that defendant received the information from plaintiff. But the plain terms of the provision say neither of those things. Moreover, those proposed interpretations would conflict with the agreement's broad specification that plaintiff would be entitled to appropriate remedies in the event of a breach of the agreement by defendant: "[S]ince the [B]reach of this Agreement will cause irreparable harm to Inventor, it is agreed that in such event Inventor will be entitled to attorney fees, equitable relief, and other remedies, in order to restrain and/or recover from any Breach." The plain terms of *that* provision indicate that the intent of the parties was that breaches of the agreement would be remediable. Defendant's interpretation of the agreement is contrary to that evident intent, because it would mean that "the Inventor" would be entitled to no remedy for breach of the agreement unless the breach is discovered and sued upon within two years of date of the agreement, leaving a potentially large class of breaches

not redressable. Accordingly, the trial court erred when it instructed the jury that the agreement was ambiguous and that it was permissible for the jury to find that the agreement was susceptible to defendant's interpretation of it.

We turn to whether the trial court's error requires reversal. ORS 19.415(2) provides that "[n]o judgment shall be reversed or modified except for error substantially affecting the rights of a party." To determine whether an error at trial substantially affected the rights of a party, we conduct a whole-record review, taking into account the parties' theories of the case, the evidence presented at trial, the jury instructions, and any other parts of the record—such as the verdict form—that may be probative of how the error affected the party complaining of it. *Purdy v. Deere and Company*, 355 Or 204, 226-29, 324 P3d 455 (2014). Our goal is to determine "whether—in an important or essential manner— the error had a detrimental influence on a party's rights." *Id.* at 226. The standard is not exact; "rather, it assesses the extent to which [the] error skewed the odds against a legally correct result." *Id.* In other words, if we understand *Purdy* correctly, there is no formulaic, categorical approach to assessing whether an error requires reversal under ORS 19.415; each case requires its own analysis, based on the record presented to us, of the likely effect of the error on the proceedings below. Where our review of the record persuades us that there is "'some' or a 'significant' likelihood that the error influenced the result," we must reverse. *Id.* At a pragmatic level, the standard requires us to assess our level of confidence in the outcome of the proceeding below. If, notwithstanding the error, we are confident in the outcome below, then we must affirm. If the error undermines our confidence in the outcome—because there is "some" likelihood that it affected the result—then we must reverse.

In support of his contention that there is some likelihood that the trial court's error affected the result of the proceeding, plaintiff relies primarily on a line of cases holding that an error in jury instructions affects the substantial rights of a party under ORS 19.415 if the error, when viewed in the context of the record as a whole, permits the jury "to reach a legally incorrect outcome." *Purdy*, 355 Or at 227. Plaintiff asserts that the erroneous instruction to the

jury—that one plausible meaning of the parties' contract was that plaintiff was not entitled to recover any losses incurred after two years or to sue for such damages—allowed the jury to apply the wrong legal rule in determining whether defendant's breach of the agreement caused plaintiff to suffer any damages. In response, defendant first argues that the record "affirmatively shows" that plaintiff was not harmed by the error, because the conflicting interpretations of the two-year provision went to the elements of breach or amount of damages, not causation, and, after being instructed, the jury found that defendant did, in fact, breach the agreement and did not reach the issue of amount of damages. Defendant's primary argument, however, is that plaintiff's failure to request a special verdict form precludes plaintiff from demonstrating that the error harmed plaintiff.

Our review of the record persuades us that the trial court's error is a reversible one. The error, in the context of the other instructions to the jury and the record as a whole, permitted the jury to apply the wrong legal rule in determining whether defendant's breach of the agreement caused plaintiff to suffer any damages. With respect to causation, the trial court instructed the jury:

> "If the defendant breached the contract then you must decide if the breach caused a loss and, if so, how much money should be paid. The mere fact that I am talking about money does not mean that you should or should not award any money.

> "You can award money for those damages *that arise naturally and necessarily* from the breach of contract and would place the plaintiff in the same position as if the contract had not been breached * * *."

(Emphasis added.) That instruction, together with the trial court's erroneous directive to the jury regarding the disputed provision of the contract, increased the likelihood that the jury would credit plaintiff's case (except for plaintiff's proposed interpretation of the disputed contractual provision) and yet return a verdict in favor of defendant by employing the following erroneous legal analysis:

(1) Defendant breached the agreement by taking plaintiff's design and using it to develop its own product

during the two-year period in which it was prohibited from doing so.

(2)   The agreement does not permit plaintiff to recover any damages incurred outside of the two-year period ending February 23, 2007.

(3)   Any damages incurred by plaintiff as a result of defendant's breach arose or were sued for after the expiration of the two-year period.

(4)   Those damages were not "damages that ar[o]se naturally and necessarily from" defendant's breach of the contract, because the contract *itself* provides that defendant has no obligation to pay those damages and plaintiff has no ability to sue for them. In other words, in restricting recoverable damages to those incurred and/or sued for within the two-year period, the contract establishes that the only damages that "naturally and necessarily" arise from a contractual breach are those that are incurred and sued for within the two-year window.

We cannot be certain that that is, in fact, the analysis that the jury employed; we acknowledge the possibility that the jury adopted the interpretation of the disputed provision advocated by plaintiff, in which case the jury would have decided the case under the correct legal rule established by the parties' agreement.[10] However, ORS 19.415 does not require reversal only when we are certain that the jury employed an erroneous legal rule to reach an erroneous legal result. It requires reversal when we are convinced that there is "some likelihood" that the jury did so. *Purdy*, 355 Or at 231-32 (error is reversible if record demonstrates that "there is some likelihood that the jury reached a legally erroneous result"; court need not be able to determine "definitively" whether jury, in fact, based its verdict on an erroneous instruction).

---

[10] For example, the jury could have found that defendant breached the agreement by not maintaining complete confidentiality of plaintiff's information within the company but that defendant did not actually use plaintiff's information to design its own center-pivot bow. Under those circumstances, the jury could have found a technical breach but further found that that breach caused plaintiff no damages.

Here, the record as a whole persuades us that there is "some likelihood" that the jury reached a legally erroneous result. Although the "contract interpretation" defense was not defendant's central defense, it was one of defendant's lead-off points in its closing argument, and, in support of that defense, defendant invoked plaintiff's own words against him. Noting that plaintiff's lawyer had called him "a dancer" in plaintiff's closing argument, defendant's lawyer argued:

"And I can dance. But it was dancing around—dancing around plaintiff with respect to the words that were used in this contract. And I think he also called me a good lawyer, which you never know how to take that. But we were talking about that.

"And the question that I asked [plaintiff] was * * *: If we take that last portion that said after two years from receipt of the information what was your understanding of what the particular term meant that you guys agreed to?

"'[PLAINTIFF'S] ANSWER: After two years of the agreement, once they had signed the agreement, after two years, they couldn't be held responsible.'

"[Plaintiff] and Mr. Strasheim are really the only folks that are going to be able to tell you what that contract means. You've got to interpret it. We're not putting words in anybody's mouth."

Defendant's argument makes it at least somewhat likely that the jury decided the case based on defendant's interpretation of the contract; it created the impression that plaintiff's arguments to the jury conflicted with plaintiff's true understanding of the agreement. That is particularly so in light of the jury instructions. The instruction on how to interpret a contract told the jury that defendant's proposed interpretation was a "possible" one and also told the jury that its role was to determine from the evidence what the disputed provision meant, increasing the likelihood that the jury would not, on its own, recognize that defendant's interpretation of the provision was not a plausible one, and would, in turn, interpret the provision by looking to the evidence in order to determine which of the proposed competing interpretations to adopt.

Finally, the trial court's answer to the jury questions during deliberations makes it at least somewhat likely that the jury used an erroneous interpretation of the contract to determine causation. The court's answer linked the question regarding the contract interpretation to the question on causation in two ways. The answer, in the context of the specific questions asked by the jury, communicated to the jury that it was *required* to answer the contract interpretation question, rather than telling the jury that it need consider the question only if it first found that any breach of the agreement had caused plaintiff to suffer damages. In so doing, the instruction suggested to the jury that the contract interpretation issue was relevant to the issue of causation. Given the structure of the verdict form—which required the jury to reach certain questions only if it answered the previous question affirmatively, but did not specify to which of those questions the contract interpretation question related—there is some likelihood that the jury interpreted the court's directive to answer that contract interpretation question as a signal that the answer to that question bore on the issue of causation. If the correct interpretation of the contract did not bear on the determination of causation, why else would the court tell the jury that it *had* to resolve the question, rather than telling the jury that it need not resolve the question *unless* it concluded that the agreement had been breached and that the breach caused plaintiff to suffer damages? At least, there is some likelihood that the jury understood the court's answer in that way, especially because the court's answer further linked the issue of contract interpretation with the issue of causation by telling the jury that the same nine jurors had to agree on the answer to the contract interpretation question and the answer to the causation question.

In urging us to conclude that the trial court's error does not require reversal under ORS 19.415, defendant advances three primary arguments. First, defendant argues that the record affirmatively shows that plaintiff was not harmed by the error, because the challenged instruction went to the elements of breach and amount of damages, not the element of causation, and the jury resolved the issue of breach in favor of plaintiff and did not reach the issue of amount of damages. Defendant contends that that precludes

the conclusion that the error harmed plaintiff; in defendant's view, the jury's resolution of the contract interpretation issue presented to it, even if the jury adopted the erroneous interpretation posed by defendant, could not have affected its assessment of causation. We disagree. As explained above, we are persuaded by our review of the record that there is some likelihood that the erroneous interpretation of the contract advocated by defendant resulted in the jury's application of an incorrect legal framework in determining causation.

Second, defendant argues that plaintiff's failure to request a special verdict form addressing the contract interpretation question precludes plaintiff from obtaining reversal under ORS 19.415. Specifically, defendant contends that, notwithstanding the Supreme Court's decision in *Purdy*, there are still circumstances "in which an appellate court will conclude that a special verdict form is required in order to adequately prove that the alleged error warrants reversal under ORS 19.415(2)." Defendant further contends that this type of case—where the alleged error sent an improper theory of defense to the jury—is the type of case in which the absence of a special verdict form, in and of itself, precludes reversal under ORS 19.415(2).

We believe that *Purdy* forecloses defendant's arguments. In *Purdy*, the Supreme Court explained that *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 61 P3d 928 (2003)—the pre-*Purdy* case generally understood by the bench and bar to categorically mandate that a party obtain a special verdict form in order to demonstrate that certain types of trial error warrant reversal under ORS 19.415[11]—did not, in fact, create a categorical requirement that a party have requested a special verdict form in order to demonstrate reversible error. *Purdy*, 355 Or at 229. Rather, the holding in *Shoup*

> "constituted a particular application of the standard in ORS 19.415(2) based on the record before the court. The error

---

[11] The "bench" with this understanding included both the Supreme Court and this court. *See, e.g., Klutschkowski v. PeaceHealth*, 354 Or 150, 164-65, 311 P3d 461 (2013) (applying *Shoup* rule to conclude that absence of special verdict form precluded the defendant from establishing that any error by trial court in sending one of plaintiff's theories of liability to the jury warranted reversal under ORS 19.415); *Klutschkowski v. PeaceHealth*, 245 Or App 524, 539, 263 P3d 1130 (2011), *aff'd in part, rev'd in part*, 354 Or 150, 311 P3d 461 (2013) (same).

did not substantially affect the defendant's rights, because the same evidence applied to all three theories of liability, and there was little likelihood that the jury had based its verdict on the invalid theory alone. And, to punctuate the analysis, the record showed that the defendant had actively prevented the use of a verdict form that would have shown whether the jury had based its verdict on the invalid theory of liability. Accordingly, the defendant was in no position to complain about the error."

*Id.*; *see id.* at 234 n 1 (Balmer, C. J., concurring) (explaining that *Shoup* does not require an appellant to prove through a special verdict form or interrogatory that a trial error *"actually"* affected the jury's verdict; rather, *Shoup* stands for the "unsurprising point" that an appellate court must conduct its ORS 19.415 review on the record before it, and that, if the record does not persuade the court that the error affected the appellant's substantial rights, then the appellate court will affirm (emphasis in original)). Thus, plaintiff's failure to request or obtain a special verdict form addressing the contract interpretation issue does not preclude him, as a procedural matter, from claiming that the trial court's error warrants reversal under ORS 19.415 if we are persuaded by the record as a whole that the trial court's error created some likelihood that the jury reached a legally erroneous result.

Finally, defendant argues that plaintiff's objection to defendant's proposed special verdict form precludes plaintiff from obtaining reversal under ORS 19.415. Defendant asserts that the special verdict form that it proposed would have made clear whether the jury agreed with defendant's "ambiguity defense theory," and that, by objecting to it, "[p]laintiff is in no position now to complain about the prejudice that could have been shown by a special verdict form."

We agree with defendant that *Purdy* leaves open the possibility that, in some circumstances, an appellant's objection to a proposed special verdict form may, in effect, estop the appellant from complaining that a particular trial error affected the appellant's substantial rights. In *Purdy*, the court emphasized that a key part of the court's reasoning in *Shoup* was that "it was significant that the defendant had affirmatively eschewed * * * the opportunity to create

a record that would have established whether the jury had found for the plaintiff on only the invalid theory of liability." *Id.* at 229. Further, the court in *Purdy* did not suggest that the *Shoup* court erred in any respect by considering the fact that the appellant had actively opposed the use of a special verdict form in assessing whether the alleged error was reversible. That suggests to us that, at least in some circumstances, an appellate court evaluating whether an error is reversible under ORS 19.415 permissibly may take into account any efforts by the appellant to "actively prevent[]" the use of a verdict form that would have established definitively an error's effect on the jury. *Id.*

Here, however, the circumstances do not warrant the conclusion that plaintiff's objection to defendant's proposed special verdict form was an effort to actively prevent the use of a proper verdict form that would have shed light on the error's effect on the jury. Defendant's proposed verdict form did not contain a question that presented the contract interpretation issue for the jury in any clear way.[12] As a result, it is difficult to see how the form, if delivered, would have aided our analysis of the effect of the trial court's error. In addition, the verdict form was problematic as a whole. As the trial court recognized, the form proposed by defendant involved a lengthy series of questions, some of which were framed in an argumentative way. Under those circumstances, we are not persuaded that plaintiff's objection to the verdict form proposed by defendant precludes plaintiff from asserting that the trial court's error is reversible under ORS 19.415.

Accordingly, we conclude that the trial court erred when it denied plaintiff's motion for a directed verdict on the issue of the correct interpretation of the agreement and

---

[12] The form did not contain any questions that asked the jury to specify which interpretation of the two-year provision that it adopted. The only question on defendant's proposed verdict form that arguably addressed the issue would have been incomprehensible to the jury. The question asked, in relevant part:

"Question No. 2: Were [defendant's] obligations under the parties' contract relieved because the information provided by [plaintiff] (answer 'yes' or 'no' to each question):

"* * * * *

"___after two (2) years from receipt of the information."

when it instructed the jury that it could permissibly adopt defendant's proposed interpretation of the agreement. We further conclude that that error requires reversal under ORS 19.415. As to the scope of the remand, plaintiff argues that the new trial should be limited to the issue of damages. *See Brown v. Bonesteele*, 218 Or 312, 335, 344 P2d 928 (1959) ("Under appropriate circumstances [an appellate] court may remand a case for a new trial on a part only of the issues raised in the original proceeding."). In response, defendant argues that any trial on remand should address defendant's "liability, given the basis for the jury's verdict." We remand for a new trial on all issues. In the light of the multiple, distinct specifications of breach, and our determination that the trial court's error had some likelihood of affecting the jury's causation determination, we conclude that this case does not present "appropriate circumstances" for us to limit the scope of trial on remand.

Given our decision to remand for a new trial, we vacate the supplemental judgment awarding attorney fees. ORS 20.220(3); *see Neumann v. Liles*, 261 Or App 567, 580, 323 P3d 521, *rev allowed*, 356 Or 516 (2014). We do not address plaintiff's other assignments of error. Plaintiff's assignments of error relating to the trial court's decision to instruct the jury regarding plaintiff's duty to mitigate damages, and the instruction that it chose to deliver, stem from plaintiff's contention that the record contained "no evidence" that would permit the jury to find that plaintiff had a duty to mitigate his damages; the record on retrial may develop differently. Similarly, the trial court resolved plaintiff's claim for equitable relief based on the trial record and on the jury's verdict; if the record develops differently, the same issues may not arise.

Reversed and remanded.