LAGESEN, P.J.
*466 This is a case involving the application of covenants, codes, and restrictions (CC & Rs) to a Salem subdivision that was developed in two phases. At issue is whether *977 those CC & Rs, which provide that "[t]his is a single family residential subdivision and no structures will be built over two stories in height," apply only to Phase One, which contains only single-family residences, or, instead, also apply to Phase Two, which contains a 60-unit, three-story apartment complex. Plaintiffs, who own a home built in Phase One of the subdivision, appeal from a stipulated general judgment[1] in favor of defendants, ruling that the CC & Rs apply only to that phase of the subdivision, and do not apply to the land contained in Phase Two of the subdivision. The question before us is whether the CC & Rs are ambiguous as to whether they apply to both phases of the subdivision, and, if so, whether the trial court's finding that the CC & Rs do not apply to Phase Two is supported by the evidence in the record. We conclude, as did the trial court, that the CC & Rs are ambiguous as to which phase they apply, and that the evidence supports the court's factual finding that the drafter intended them to apply only to Phase One.
I. FACTS
A. The River Valley Subdivision Approval Process
The relevant facts are not disputed. Defendants, Stephanie Fry, Inc., and River Valley Terrace, LLC, are developers. In 2005, they acquired a 10.30-acre piece of property, located in Salem. That property was, and is, zoned RM-1 (Multiple Family Residential) under the Salem Area Comprehensive Plan.[2] Their plan was to develop the *467 property into a mixed-use residential community, called the River Valley Subdivision, in two phases.
Because their plan did not comport with all of the requirements applicable to land zoned RM-1, defendants sought a land use variance from the City of Salem in Variance Case No. 05-5.[3] Their variance application stated that the purpose of the requested variance was "to allow a mixed residential development comprised of apartment units and individual single family lots." To accomplish that proposed mixed residential development, defendants requested that they be allowed to subdivide a portion of the property into lots smaller than the minimum lot size otherwise required under the RM-1 zoning requirements, with the intention that single family homes would be built on those lots. To ensure that the proposed development nonetheless complied with density requirements applicable in RM-1 zones, not-withstanding the fact that their proposal would result in the development of single family homes, defendants proposed building multi-family apartment units on Lot 39 of the development. Lot 39 is approximately 1.9 acres in size. Thus, as a whole, the proposed subdivision was to consist of 37 single family lots, one lot for a private roadway, and an apartment complex on Lot 39. The city approved the requested variance in October 2005. The approval order provided:
"Based on the Facts and Findings and materials submitted in the application, staff recommends that the Hearings Officer GRANT Variance Case No. 05-5 to reduce the minimum lot size required for lots subdivided after January 1, 1999 as required under [Salem Revised Code *978 (SRC) ] Chapter 148.240(c) to less than 20,000 square feet, for property zoned RM-1 (Multiple Family Residential), approximately 11.68 acres in size, and located at 1740, 1760, and 1790 Wallace Road NW, subject to the following condition: *468 "1. Prior to subdivision approval or development occurring on the property where no subdivision is proposed, provide evidence that the proposed development can conform to the applicable development standards of the code while maintaining an overall project density as allowed by the RM-1 zone."
After obtaining the requested variance, defendants applied for approval to subdivide the 10.30-acre property into 39 lots. The Subdivision Review Committee approved the application in August 2006, under case number 2007-012347. The approval preamble stated that the purpose of the proposal was to "subdivide approximately 10.30 acres into 39 lots, 37 of which would be for single-family dwellings, Lot 1 contains 'Hope Street,' a private roadway, and Lot 39 is proposed as an apartment complex to be developed as Phase 2 of the subdivision." Condition 9 of the approval stated, "Development of the property shall comply with all requirements of the Hearings Office decision dated October 20, 2005 for Variance 05-5." The approval described the project in phases, with Phase Two consisting of the completion of the apartment complex.
As part of the approval process, defendants had to comply with SRC chapter 205. That chapter requires final plat approval to finalize and record a division of land. SRC 205.035. Defendants recorded the final plat, which was identified as "14-20." The final plat specifically references the subdivision approval and condition 9 contained in the approval, stating, "CONDITIONS OF APPROVAL OF THIS PLAT ARE RECORDED IN DOCUMENT NO. 2007-012347." (Capitalization in original.)
After the final plat was recorded, Richard Fry, the co-owner and corporate secretary for defendant Stephanie Fry, Inc., recorded CC & Rs for the subdivision in September 2007. The CC & Rs were titled "River Valley Subdivision." The CC & Rs contained a provision-which, as it turns out, is at the heart of the parties' dispute in this case-stating that "[t]his is a single family residential subdivision and no structures will be built over two stories in height." Underneath the document's title is a handwritten indication that the CC & Rs were "For Subdivision plat 14-20, Polk County."
*469 In 2012, after houses had been constructed on all of the single-family lots, defendants initiated the design and site plan approval process for the proposed apartment units, as was required by SRC chapters 220 and 225. In May 2014, the city's planning division approved defendants' "Class 1 Design Review and Class 2 Site Plan Review" for a 60-unit apartment complex. The approval states that the 60-unit complex complied with the applicable density requirements because, "[f]or the subdivision to meet the overall density requirement for the RM1 zone, lot 39 (the subject property) was designated for a multifamily development to contain approximately 60 dwelling units." The city determined that "[t]he proposed development shows 60 dwelling units, consistent with [the variance and subdivision approval]."
B. Plaintiffs' Purchase of a Single-Family Home in the River Valley Subdivision
In May 2015, plaintiffs, Kathryn and David Van Atta, purchased a single-family home built in Phase One of the subdivision. At the time of their purchase, the subdivision had 37 single-family homes. When plaintiffs purchased their home, they received a copy of the CC & Rs and a preliminary title report prior to closing that identified the CC & Rs as an exception to the title policy. The title report did not identify any prior land use decisions or other documents that created an exception to the CC & Rs' standards for single-family residences.[4]
*979 *470 C. Litigation over the CC & Rs Governing the River Valley Subdivision
When defendants began grading Lot 39 and plaintiffs learned it was in preparation for a 60-unit, three-story apartment complex, plaintiffs sent a demand letter to defendants requesting that they cease construction on Lot 39, as it would violate the provision of the CC & Rs that states, "This is a single family residential subdivision and no structures will be built over two stories in height." Defendants did not respond to the request. Plaintiffs then filed a complaint against defendants for declaratory and injunctive relief and for breach of the CC & Rs. Among the relief requested was a judgment (1) declaring that defendants were in breach of the CC & Rs, (2) enjoining defendants from proceeding with construction of the apartment complex, and (3) ordering defendants to specifically perform in accordance with the CC & Rs by constructing only single-family dwellings. Plaintiffs then filed a motion for an order to show cause why a preliminary injunction should not enter. At the preliminary injunction hearing, plaintiffs argued that the plain meaning of the phrase, "[t]his is a single family residential subdivision and no structures will be built over two stories in height," contained in the CC & Rs, prohibited construction of multi-family housing and structures taller than two stories on all lots, including Lot 39. Defendants agreed that the CC & Rs prohibited construction of multi-family housing and structures over two stories high on all lots in Phase One, but contended that the CC & Rs do not apply to Phase Two-that is, construction on Lot 39.
The trial court denied plaintiffs' request for a preliminary injunction. It concluded that the word "this" in the first sentence of the CC & Rs was ambiguous, and that defendants' interpretation of the CC & Rs to not apply to Lot 39 appeared to be correct; thus, there was "no substantial likelihood that Plaintiffs [would] prevail on the merits." The trial court denied plaintiffs' motion and, after considering the underlying land use planning documents used to create *471 the subdivision, determined that the CC & Rs were ambiguous as to what they were intended to apply to and further found that defendants' interpretation that the CC & Rs were meant to apply to only Phase One was most consistent with the entirety of the record. As noted earlier, the parties stipulated to convert the trial court's order denying plaintiffs' motion for a preliminary injunction into a general judgment, reserving the right to appeal.
Plaintiffs reiterate the arguments that they made below. They contend that the CC & Rs unambiguously apply to all lots in the subdivision, including Lot 39, and that the trial court erred in concluding otherwise. Defendants likewise repeat the arguments they made below, contending that, when viewed in light of the planning history of the development, the CC & Rs' specification that "[t]his is a single family residential subdivision and no structures will be built over two stories in height" is ambiguous as to whether that specification refers to the subdivision as a whole or only to Phase One of the subdivision and, further, in view of that ambiguity, that the trial court correctly found, based on the evidence, that the CC & Rs were intended to apply only to Phase One of the subdivision.
II. STANDARD OF REVIEW
We review for legal error a trial court's determination that contractual wording is ambiguous. Hadley v. Extreme Technologies, Inc. , 272 Or. App. 49, 63, 355 P.3d 132, rev. den. , 358 Or. 449, 366 P.3d 719 (2015). We review the trial court's "explicit *980 and implicit findings of fact for any evidence in the record to support them." Batzer Construction, Inc. v. Boyer , 204 Or. App. 309, 319, 129 P.3d 773, rev. den. , 341 Or. 366, 143 P.3d 239 (2006).
III. ANALYSIS
As framed by the parties, the issues before us are (1) whether the CC & Rs are ambiguous as to whether they apply to both phases of the subdivision and, (2) if so, whether the trial court's findings that the CC & Rs were not intended to apply to Phase Two is supported by the evidence. In particular, given the way that the parties have presented the issue, the question is whether the word "this" in the sentence *472 "[t]his is a single family residential subdivision and no structures will be built over two stories in height" is ambiguous as to which phase, or phases, that it applies. For the reasons that follow, we conclude that the CC & Rs are ambiguous as to what phase they were intended to apply, and that the evidence supported the trial court's finding that the CC & Rs do not apply to Phase Two.
Our role in interpreting an instrument is to give effect to the intent of its drafter or drafters. See ORS 42.220 ("In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting."); see also Deerfield Commodities v. Nerco, Inc., 72 Or. App. 305, 317, 696 P.2d 1096, rev. den., 299 Or. 314, 702 P.2d 1111 (1985).
Here, it is the drafter of the CC & Rs "whose language" we are interpreting for purposes of ORS 42.220.[5] To give effect to the intent behind that wording, we follow the three-step methodology laid out in Yogman v. Parrott , 325 Or. 358, 361, 937 P.2d 1019 (1997) (explaining methodology for interpreting contracts, including restrictive covenants). See also Leahy v. Polarstar Development, LLC , 223 Or. App. 373, 376, 195 P.3d 919 (2008) ( Yogman framework governs the interpretation of CC & Rs). Under that framework,
"[f]irst, we look to the text of the disputed provisions in the context of the whole document. Eagle Industries, Inc. v. Thompson , 321 Or. 398, 405, 900 P.2d 475 (1995). If the meaning is clear, our analysis ends. Yogman , 325 Or. at 361 [937 P.2d 1019]. If we determine that the restrictive covenants are ambiguous, we then examine extrinsic evidence of the contracting parties' intent to resolve that ambiguity. If the ambiguity cannot be resolved after considering that evidence, we turn to maxims of construction. Yogman , 325 Or. at 363-64 [937 P.2d 1019]. We may also examine extrinsic evidence for the purpose of determining whether there is ambiguity. Batzer Construction, Inc. v. Boyer , 204 Or. App. 309, 317-18, 129 P.3d 773, rev. den. , 341 Or. 366 [143 P.3d 239] (2006)."
Leahy , 223 Or. App. at 376, 195 P.3d 919.
*473 As noted, under that framework, we may consider extrinsic evidence of the circumstances in which a document was drafted in order to understand what the drafter intended at the time of drafting and, in particular, to assess whether, in that context, certain terms are ambiguous. See City of Eugene v. Monaco , 171 Or. App. 681, 687, 17 P.3d 544 (2000) (interpreting ORS 42.220 and explaining that the extrinsic evidence that the court may consider is limited to the circumstances under which the agreement was made). Evidence of such circumstances may demonstrate that a word has more than one plausible interpretation in the context in which it was drafted and, therefore, is ambiguous. See Abercrombie v. Hayden Corp. , 320 Or. 279, 286, 883 P.2d 845 (1994) (holding that underlying circumstances may be considered in order to determine whether a term is ambiguous); Criterion Interests, Inc. v. Deschutes Club , 136 Or. App. 239, 246, 902 P.2d 110, adh'd to as modified on recons. , 137 Or. App. 312, 903 P.2d 421 (1995) (explaining that extrinsic evidence may only affect interpretation when there is language in *981 the instrument that is susceptible to being construed to carry out the proposed intent).
Our decision in Rodway v. Arrow Light Truck Parts , 96 Or. App. 232, 236, 772 P.2d 1349 (1989), illustrates how the circumstances surrounding the execution of a document can demonstrate an ambiguity that might not otherwise be apparent from the face of a document. At issue there was whether an indemnity clause that, by its terms, provided indemnity for acts by an "officer" or "director," covered acts taken by an individual, Gregory, on behalf of the corporation before he formally became an officer or director. Specifically, the question was whether the clause covered his act of signing a lease on behalf of the corporation prior to the time he became an officer or director. Relying on ORS 42.220, we determined that, in view of the underlying circumstances in which the indemnity clause had been drafted, the terms "officer" and "director" were ambiguous terms[6] that could, given the underlying circumstances, plausibly include a person "about to become" an officer or director. Id. at 236, 772 P.2d 1349.
*474 Those circumstances included the facts that the indemnity clause had been drafted in connection with Gregory's efforts to sever his ties with the corporation and that Gregory accepted a reduced price for his stock in the corporation as part of the severance process. Id. at 234, 772 P.2d 1349. We reasoned that "[t]he circumstances under which the indemnity clause was written support the implicit conclusion of the trial court that the purpose of the clause was to relieve Gregory of liability for acts taken during his short term as an officer of the company," including liability for his act of signing the lease immediately prior to becoming an officer in the company. Id. at 236, 772 P.2d 1349.
Here, as was the case in Rodway , the underlying circumstances of the drafting of the CC & Rs indicate that the reference to "this" in the phrase "[t]his is a single family residential subdivision and no structures will be built over two stories in height," is ambiguous as to whether it was intended to apply to all of the lots in the subdivision or just the single-family lots developed in Phase One. Those underlying circumstances include: the city's decision approving defendants' variance application, which states that "[t]he purpose of the requested variance is to allow a mixed residential development comprised of apartment units and individual single family lots"; the subdivision application, which explicitly states that "lot 39 is proposed as an apartment complex to be developed as Phase 2 of the subdivision"; and the recorded plat map. Those circumstances show both that defendants' plan from the outset was to develop a 60-unit apartment complex on Lot 39 and that at least some of defendants' government approvals hinged, in part, on the fact that that was the plan for Lot 39. Additionally, as noted earlier, the CC & Rs, which were recorded just before the start of the development of the single family lots in Phase One, refer to "Subdivision Plat 14-20." The recorded plat references the conditions of approval of the plat and states that those conditions are recorded in land use case number 2007-012347. Those conditions of approval, in turn, reference the variance and the plan for an apartment complex to be developed in Phase Two. Under those circumstances, it is plausible that the word "this" was intended by the drafter to refer only to single family lots in Phase One, and not to the single large *475 Lot 39 in Phase Two on which the apartment complex had been proposed. We thus conclude, as did the trial court, that the CC & Rs are ambiguous as to whether they apply to all lots in the subdivision, or just the single family lots in Phase One.
That leaves the question of whether the trial court's resolution of that ambiguity in favor of defendants was correct. As noted earlier, resolution of an ambiguity based on the underlying evidence is a factual question, on which we accept the trial court's factual findings if there is any evidence in the record to support them. See Batzer Construction, Inc. , 204 Or. App. at 319, 129 P.3d 773. Here, the trial court's factual finding that the CC & Rs were intended to apply only to Phase *982 One, and not to the development of Lot 39 in Phase Two, is supported by the evidence. The same evidence that demonstrates that the CC & Rs' reference to "this" is ambiguous supports a factual finding that the drafter of the CC & Rs intended to refer only to the single family lots in Phase One. Additionally, Richard Fry testified explicitly that he had drafted the CC & Rs and that he "never expect[ed] that you could record CC & Rs on undeveloped property. So I guess I just assumed that it was only for phase 1 of the single-family subdivision, which are lots 2 through 38," and that his intent was for the CC & Rs to apply only to the single family lots. In view of that evidence, the trial court did not err when it found, as a factual matter, that the CC & Rs were intended to apply to the single family lots only and that the word "this" in the phrase "[t]his is a single family residential subdivision and no structures will be built over two stories in height" refers to the single family lots in Phase One.
For the above reasons, we affirm the judgment of the trial court.
Affirmed.

After filing this case, plaintiffs promptly moved for a preliminary injunction to bar the construction of the apartment complex in Phase Two, contending that the CC & Rs precluded defendants from building apartments. After the trial court determined that there was not a substantial likelihood that plaintiffs would prevail on the merits, and denied the motion for a preliminary injunction, the parties stipulated to convert the court's denial order into a general judgment, reserving the right to appeal.

Salem Revised Code 513.001 provides:
"The purpose of the Multiple Family Residential-I (RM-I) Zone is to implement the multiple family residential designation of the Salem Area Comprehensive Plan through the identification of allowed uses and the establishment of development standards. The RM-I zone generally allows multiple family and two family residential uses, along with a mix of other uses that are compatible with and/or provide services to the residential area."

We consider the documents submitted with defendants' answer and their "Response to Plaintiffs' Motion For Order to Show Cause Why Preliminary Injunction Should Not Enter," as well as the exhibits formally entered at the hearing on plaintiffs' motion, because the parties and the trial court appear to have treated all of those documents as part of the record.

Although the trial court found that "even Plaintiffs believed the property across the street from them would contain a multi-family structure as they were told by the Realtor the developer planned on erecting apartments," the record does not support a finding about what, exactly, plaintiffs knew about Lot 39 prior to closing on their home. The evidence shows that, approximately two weeks after closing, David Van Atta contacted the sellers' realtor, via email, stating, "[Y]ou had mentioned something about the zoning of our neighborhood being RM. Could you reiterate to me what this means? Apartments....? If so how would one go about changing this." A response email was not provided in the record. Additionally, Kathryn Van Atta testified that, a week before closing on their home, her husband had "inquired about the vacant lot across the street, lot 39. And [the listing agent] led us to believe that the-or he told us the lot was zoned multifamily and that the owner/developer was thinking about putting some high-end townhomes, if not getting rezoned to be single-family homes." Van Atta further testified that she was "given no indication or had no reason to suspect that apartments would be placed on that lot" and that she, in her mind, regards townhomes as distinct from apartments.
Regardless, although the trial court's finding about plaintiffs' knowledge is not supported, that finding does not bear on the proper interpretation of the CC & Rs.

CC & Rs are typically drafted by the developer of a community and included in the community's recorded declaration. See, e.g. , ORS 94.580. Ordinarily, homeowners may later amend CC & Rs through a community vote. See, e.g. , ORS 94.590.

We characterized the ambiguity as a "latent or extrinsic ambiguity," recognizing that the ambiguity would not be apparent from the face of the indemnity clause. Rodway , 96 Or. App. at 236, 772 P.2d 1349.